WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jolene Mae Rolston, | No. CV-14-08040-PCT-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Jolene Mae Rolston seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits under the Social Security Act (the Act).  The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b), and have filed briefs in accordance with Local Rule of Civil Procedure 16.1.  For the following reasons, the Court affirms the Commissioner's decision.

## I.   Procedural Background

On November 4, 2010, Plaintiff applied for disability insurance benefits under Title XVI of the Act.  (Tr. 21.)[1]  Plaintiff alleged disability beginning November 1, 2010.  (*Id.*)  After the Social Security Administration (SSA) denied Plaintiff's initial application and her request for reconsideration, she requested a hearing before an administrative law judge (ALJ).  After conducting a hearing, the ALJ issued a decision finding Plaintiff not

---

[1]   Citations to "Tr." are to the certified administrative transcript of record.  (Doc. 17.)

disabled under the Act.  (Tr. 21-29.)  This decision became the final decision of the Commissioner when the Social Security Administration Appeals Council denied Plaintiff's request for review.  (Tr. 1-6); *see* 20 C.F.R. §§ 404.981, 416.1481 (explaining the effect of a disposition by the Appeals Council.)[2]  Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

## II.    Administrative Record

The record before the Court establishes the following history of diagnosis and treatment related to Plaintiff's health.  The record also includes opinions of state agency physicians who examined Plaintiff and reviewed the records related to Plaintiff's impairments, but who did not provide treatment.

### A.    Treatment Records

#### 1.    North Country Health Care and Urgent Care

Since approximately 2006, Plaintiff has received primary health care from North Country Health Care (North Country).  (Tr. 256-89.)  On October 11, 2010, Plaintiff saw Nurse Practitioner (NP) Susan Collins at North Country primarily for "breathing issues." (Tr. 260.)[3]  Plaintiff complained of depression and anxiety (fear of leaving the house and panic attacks), back and hip pain, difficulty breathing, and shortness of breath with activity.  (Tr. 262.)  NP Collins noted that Plaintiff was accompanied by her daughter, granddaughter, and young grandson.  (*Id.*)  Plaintiff reported that her family was with her "for support and to assure she [did not] wiggle out of being seen as she [was] very anxious and agoraphobic by nature and coming to the doctor's office [was] a terror producing thought."  (*Id.*)  NP Collins noted that Plaintiff described panic attacks when she was in the shower and that she "flit[ted] from one thought to another and was very nervous."  (Tr. 262-63.)

---

[2]  20 C.F.R. part 404 addresses Title II of the Act, and has parallel citations in part 416, which addresses Title XVI.

[3]  The October 11, 2010 treatment notes also appear at Tr. 278-81.

Plaintiff reported that she started smoking when she was seventeen and was smoking forty cigarettes per day. (Tr. 261-62.) Plaintiff reported being eager to quit smoking. (Tr. 262.) She reported that she was "a poor house cleaner because the effort cause[d] her to have a hard time breathing." (*Id.*) On examination, Plaintiff was in "no acute distress," and had "no rales, rhonchi, or wheezes." (*Id.*) NP Collins assessed shortness of breath, anxiety, panic attack, and tobacco abuse. (Tr. 263.) She prescribed Advair and Proair inhalers and referred Plaintiff for spirometry testing and to "a mental health facility for her depression fears, [and] phobias." (Tr. 263.) She also discussed a smoking cessation plan. (*Id.*)

Spirometry testing performed on October 25, 2010 showed evidence of "moderate" Chronic Obstructive Pulmonary Disease (COPD). (Tr. 407-08, 287-90.) During an October 25, 2010 appointment with Dr. Shipra Bonsal, Plaintiff reported that her prescribed inhaler QVAR was not "working," and she was still using ProAir up to five to seven times a day. (Tr. 258.) On examination, Plaintiff had a "wheeze" and "reduced breath sounds diffusely." (*Id.*) Dr. Bonsal indicated that Plaintiff had "no depression, anxiety, or agitation." (*Id.*) Dr. Bonsal recommended that Plaintiff, who reported smoking seven cigarettes per day, stop smoking, use a humidifier, and stay hydrated. (*Id.*) She also prescribed Atrovent and Adviar inhalers, and removed QVAR.

During a November 1, 2010 appointment, NP Collins noted that spirometry testing revealed "moderate COPD." (Tr. 271.)[4] During that appointment, Plaintiff reported that she had been smoking two packs of cigarettes per day, but she had reduced her cigarette intake. (*Id.*) Plaintiff reported shortness of breath "only when doing activities." (*Id.*) Plaintiff denied dizziness and fatigue. (*Id.*) Plaintiff reported doing better on ProAir and said that her insurance had denied the Advair and recommended QVAR or Flovent. (*Id.*) On examination, Plaintiff was in "no acute distress," and had "no rales, rhonchi, or

---

[4] Treatment notes from the November 1, 2010 appointment are duplicated at Tr. 283-85 and Tr. 287-89.

wheezes." (Tr. 272.) NP Collins assessed COPD, prescribed a QVAR inhaler, and discussed a smoking cessation plan with Plaintiff. (*Id.*)

On May 16, 2011, Plaintiff saw Dr. Bansal for complaints of continued shortness of breath. (Tr. 401.) Plaintiff reported using ProAir five to seven times per day and that she had cut back to seven cigarettes a day. (*Id.*) On examination, Dr. Bansal found left upper quadrant wheezing and reduced breath sounds diffusely. (Tr. 402.) She also noted that Plaintiff had no "depression, anxiety, or agitation." (*Id.*) Dr. Banal found that Plaintiff's COPD was inadequately controlled and adjusted her medication. (Tr. 401.) She prescribed an Atrovent inhaler in place of QVAR. (Tr. 402-03.) She recommended that Plaintiff stop smoking, use a humidifier, and stay hydrated. (Tr. 402.)

During a July 18, 2011 appointment with Dr. Bansal, Plaintiff reported that the Advair was "working." (Tr. 398.) Plaintiff reported that she was down to two cigarettes a day and was "doing better." (Tr. 399.) On examination, Plaintiff was in no acute distress, she had "no rales, rhonci, or wheezes," but had "reduced breath sounds diffusely." (*Id.*) Dr. Banal noted that Plaintiff's COPD had improved significantly on Advair and Atrovent and that she was "off [the] emergency inhaler entirely." (*Id.*) She also noted that Plaintiff's tobacco abuse had improved and that Plaintiff was down to two cigarettes a day. (*Id.*) Dr. Bansal prescribed Atrovent, Advair, and ProAir. (*Id.*)

On March 23, 2012, Plaintiff presented to Urgent Care for bronchitis. (Tr. 318.) She was prescribed a cough suppressant and a course of antibiotics and was advised to "rest and get plenty of fluids." (*Id.*)

### 2. Matthew Wise, M.D.

On June 11, 2012, Plaintiff saw Dr. Wise to establish primary medical care. (Tr. 361-63.) She reported difficulty walking due to shortness of breath, coughing, and wheezing. (Tr. 361.) Plaintiff reported that she had been a heavy smoker for years but that she was down to two cigarettes daily. (*Id.*) She also reported "severe anxiety," explaining that meeting new people or going to the grocery store had been a challenge for her for the last ten years. (*Id.*) Plaintiff reported fatigue, weakness, shortness of breath,

wheezing, coughing, anxiety, and agoraphobia.  (Tr. 361-62.)  On examination, Plaintiff was in no apparent distress, her breath sounds were "clear to auscultation bilaterally," and she had no rales or wheezes.  (Tr. 362.)  Dr. Wise diagnosed COPD, anxiety disorder, tobacco abuse, and back pain, and prescribed Advair, ProAir, and sertraline (Zoloft) for anxiety.  (Tr. 363.)  He encouraged Plaintiff to cut back to one cigarette per day and to try to quit entirely.  (*Id.*)  Dr. Wise noted that Plaintiff attended the appointment with her sister.

During a July 3, 2012 appointment, Plaintiff reported no change in her anxiety on the Zoloft and said that she had not been sleeping well.  (Tr. 359.)  Plaintiff reported shortness of breath on exertion and wheezing.  (*Id.*)  On examination, Plaintiff was in no acute distress and was comfortable.  (*Id.*)  Dr. Wise assessed COPD, anxiety disorder, and back pain.  (*Id.*)  He prescribed Advair, Atrovent, ProAir, and sertraline.  (Tr. 360.)  He advised Plaintiff to quit smoking.  (*Id.*)

On August 14, 2012, Plaintiff reported that the Zoloft was "helping some," but that she "still ha[d] enough anxiety that her stomach [was] upset."  (Tr. 357.)  She reported that her anxiety was "especially bad" when she was told she had to go to Tucson to see a doctor for her disability claim.  (*Id.*)  She reported that she did not take trips due to her anxiety and that going anywhere, including Dr. Wise's office or to the store, caused anxiety.  (*Id.*)  On examination, Plaintiff was pleasant, comfortable, and in no acute distress.  (Tr. 358.)  She had "nonlabored breathing, no distress, CTA bilaterally with no w/r/r [wheeze/rales/rhoncitis], [and] good air movement."  (*Id.*)  Dr. Wise assessed COPD, anxiety disorder NOS (not otherwise specified), back pain, and tobacco abuse.  (*Id.*)  Dr. Wise increased the dosage of Zoloft and recommended counseling. (Tr. 358.)  Plaintiff reported that she was "too anxious to go" to counseling, but could attend counseling "perhaps after she [was] on a higher dose of meds."  (*Id.*)  Dr. Wise continued Advair, ProAir, and Atrovent, and recommended smoking cessation.  (*Id.*)

During an August 28, 2012 appointment, Plaintiff reported that the increased dosage of Zoloft had caused diarrhea and requested a different medication.  (Tr. 354.)

Dr. Wise changed Plaintiff's antidepressant to citalopram (Celexa). (Tr. 355.) Plaintiff also reported that she used her inhalers with activities such as vacuuming and that she had cut down to two cigarettes total in the preceding week. (Tr. 354.) She reported having an appointment to see a psychologist in connection with her disability claim. (Tr. 355.) On examination, Plaintiff was in no acute distress, pleasant, comfortable, and alert. (*Id.*) She had "nonlabored breathing, no distress, CTA bilaterally, no w/r/r, [and] good air movement." (*Id.*) "Psychologically," she had "good eye contact, normal insight, no thought disturbances," and was "slightly anxious appearing." (*Id.*)

On September 20, 2012, Plaintiff reported that she had completed "her disability test with a psychologist in Scottsdale," and that she "had a panic attack there in the office." (Tr. 446.) She reported that her anxiety attacks continued, and she remained housebound. (*Id.*) Plaintiff stated that she had cut back to smoking one cigarette every fews day. (*Id.*) Plaintiff reported shortness of breath with exertion and wheezing. (Tr. 447.) On examination, Plaintiff was in no acute distress and was pleasant. (Tr. 448.) Her "breath sounds were clear to auscultation bilaterally," and she had no rales or wheezes. (*Id.*) Dr. Wise assessed COPD, tobacco abuse, anxiety disorder NOS, back pain, and diarrhea. (*Id.*) He continued Plaintiff's prescription for her Atrovent, ProAir, Advair, and Celexa. (Tr. 449.) He encouraged Plaintiff to quit smoking. (Tr. 448.)

## B.    Medical Opinions

### 1.    Patricia Rose, ED.D

On January 4, 2011, a state agency licensed psychologist, Dr. Rose, examined Plaintiff for her disability benefits application. (Tr. 296-301.) Plaintiff attended the examination alone, but reported that a friend drove her to the doctor's office. (Tr. 296.) Plaintiff reported that she was unable to work due to symptoms arising from anxiety and COPD. (*Id.*) She reported that she had been anxious and afraid to drive for the six years, since her involvement in a car accident, and stated that she had difficulty waitressing due to breathing problems, and because she periodically got boils on her legs. (Tr. 297, 299.)

Plaintiff also stated that although she experienced anxiety daily, she could go out in public when she had to do so. (Tr. 297-98.)

On examination, Plaintiff was oriented, had good short-term memory, and normal attention and concentration. (Tr. 296.) She was pleasant, cooperative, friendly, and had good interpersonal skills. (Tr. 297.) During the mental status examination, Plaintiff made three mistakes on "serial threes from forty," and mistakes on simple arithmetic problems, which was indicative of possible mild intellectual deficits. (Tr. 296.) Dr. Rose noted that Plaintiff had no signs of psychosis, depression, or anxiety. (*Id.*)

Dr. Rose opined that Plaintiff had "avoid[ed] dealing with the world for a long period of time, and she ha[d] developed a sense of anxiety about dealing with new situations." (Tr. 299.) Dr. Rose also noted that, based on Plaintiff's report, although she experienced anxiety at times during her waitressing job, she was able to "work through it" by getting help from her coworkers. (Tr. 299.) Dr. Rose, opined that Plaintiff "could probably [work through anxiety at work] currently." (*Id.*) Dr. Rose diagnosed anxiety disorder and ruled out agoraphobia because of Plaintiff's ability to go out in public or ride in a car "when necessary." (Tr. 300.) She also diagnosed possible mild intellectual deficits and COPD. (*Id.*) On a Psychological/Psychiatric Medical Source Statement, Dr. Rose opined that Plaintiff did "not present with any significant psychiatric barriers to employment." (*Id.*)

### 2. Mark Brecheisen, D.O.

On January 11, 2011, state agency physician Dr. Brecheisen examined Plaintiff for her disability benefits application. (Tr. 304-07.) Plaintiff reported a history of COPD and emphysema. (Tr. 304.) Plaintiff reported that she used inhalers daily, chronically felt short of breath, and tried to stay home to avoid exposure to things that aggravated her condition. (*Id.*) Plaintiff reported that she could perform all activities of daily living and that she could drive. (Tr. 305.)

On examination, Dr. Brecheisen noted that Plaintiff walked around the examination room without assistance. (*Id.*) Dr. Brecheisen noted that Plaintiff had

coarse and diminished breath sounds with a mild expiratory wheeze.  (Tr. 306.)  Plaintiff had a normal gait, full range of motion in all joints, full muscle strength, no sensory deficits, and normal reflexes.  (Tr. 306-07.)

He conducted a pulmonary function test and found that Plaintiff "gave inadequate effort."  (Tr. 302.)  Dr. Brecheisen interpreted the pulmonary function test as consistent with "mild obstructive pulmonary disease."  (Tr. 302, 307.)  Dr. Brecheisen diagnosed a history of COPD, anxiety, and cervical cancer.  (Tr. 307.)  He found "no objective medical evidence to support [Plaintiff's] allegations of permanent disability for a period of no less than 12 continuous months of this exam date."  (*Id.*)  He did not identify any functional limitations.  (*Id.*).

### 3.    Matthew Wise, M.D.

On June 11, 2012, the date of his first appointment with Plaintiff, treating physician Dr. Wise completed a Multiple Impairment Questionnaire.  (Tr. 319-26.)  He identified his diagnoses as COPD and chronic anxiety.  (Tr. 319.)  He stated that his diagnoses were supported by testing that showed moderate COPD in 2010 and Plaintiff's complaints of shortness of breath with ambulation.  (Tr. 319-20.)  He identified Plaintiff's primary symptoms as shortness of breath and "severe anxiety with agoraphobia." (Tr. 320.)  Dr. Wise did not complete the portions of the questionnaire regarding Plaintiff's physical functional limitations.  (Tr. 322-23.)  Additionally, he did not indicate how often Plaintiff's symptoms would interfere with attention and concentration. (Tr. 324.)  However, he noted Plaintiff's anxiety would worsen if she were placed in a competitive work environment (Tr. 323), and that "emotional factors contribut[ed] to the severity of [Plaintifff's] symptoms and functional limitations."  (Tr. 324.)  He explained that due to her "severe anxiety," Plaintiff's "family ha[d] to convince her to go to app[ointmen]ts or even shopping and [had] to accompany her or she [would not] go." (*Id.*)  Dr. Wise opined that Plaintiff was "incapable of even low stress" in a work environment due to her anxiety.  (*Id.*)

One month later, on July 12, 2012, Dr. Wise completed a Psychiatric/Psychological Impairment Questionnaire.  (Tr. 343-50.)  Dr. Wise identified Plaintiff's diagnoses as anxiety disorder, COPD, and back pain.  (Tr. 343.)  He identified her primary symptoms as anxiety and difficulty breathing.  (Tr. 345.)  To support the limitations identified on the questionnaire, Dr. Wise cited Plaintiff's appetite disturbance with weight change, recurrent panic attacks, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, persistent irrational fears, and generalized persistent anxiety.  (Tr. 344.)  He opined that Plaintiff was "markedly limited" in her abilities to work in coordination with others without being distracted by them, complete a normal workweek without interruption from psychologically based symptoms, perform at a consistent pace, to interact appropriately with the public, to get along with co-workers without distracting them or exhibiting behavioral extremes, and to travel to unfamiliar places or use public transportation.  (Tr. 345-48.)  He explained that Plaintiff had severe anxiety when meeting new people and did not go to the store without a family member.  (Tr. 348.)  He concluded that Plaintiff could not tolerate a "low stress" work environment and that she would likely miss more than three workdays a month due to her impairments.  (Tr. 349-50.)

On September 20, 2012, Dr. Wise wrote a letter "to whom it may concern" summarizing his treatment of Plaintiff.  (Tr. 455-56.)  He stated that he had treated Plaintiff for COPD and "severe anxiety" since June 2012.  (*Id.*)  He stated that Plaintiff's anxiety "is such that she has agoraphobia and does not go to public places including stores."  (Tr. 455.)  He noted that Plaintiff's agoraphobia had interfered with her medical care in that she would not attend an appointment for a colonoscopy due to anxiety.  (*Id.*)

Dr. Wise also stated that COPD further limited Plaintiff's activities.  (*Id.*)  Dr. Wise noted that the damage to Plaintiff's lungs was "not reversible" and that medications could "help to improve some of the reactive airway component."  (*Id.*)  He stated that Plaintiff's anxiety was exacerbated by the shortness of breath related to her COPD, and opined that she would continue to require counseling and medication.  (*Id.*)

He concluded that, due to those impairments, Plaintiff would be "unable to work" for longer than twelve months.  (*Id.*)

### 4.   Shannon Tromp, Ph.D.

On recommendation from her attorney (Doc. 18 at 8, Tr. 365), on September 17, 2012, Plaintiff was examined by Dr. Tromp for her claim for mental impairments. (Tr. 365-71.)  Dr. Tromp examined Plaintiff and reviewed the medical record related to Plaintiff's mental impairments.  (Tr. 365.)  Dr. Tromp noted that Plaintiff's sister took her to the appointment, but that Plaintiff "presented for the exam[ination] alone."  (Tr. 366.)

Plaintiff reported that she had experienced panic attacks most of her life, which had gotten particularly "out of control" over the preceding seven years.  (Tr. 366.) Plaintiff reported that she rarely left her home except when her sister or daughter took her to her doctors' appointments about twice a month.  (Tr. 366-67.)  She reported that, since a car accident, she was afraid to drive.  (Tr. 366.)  Plaintiff reported that the three-hour drive to the exam caused her a great deal of panic symptoms.  (Tr. 369.)   She reported that her sleep was interrupted and limited, and her energy was low.  (*Id.*)  Plaintiff stated that she had not seen a psychiatrist or a counselor because it "would make [her] panic." (Tr. 367.)

Dr. Tromp observed that Plaintiff was teary-eyed on initial presentation and appeared "mildly anxious" during the examination.   (Tr. 369.)   On examination, Dr. Tromp found that Plaintiff had good eye contact, was "friendly and laughed a lot", her thoughts were "logical and goal directed," her comprehension was "good," her mood was "a little panicky, a little nervous but comfortable?" her affect was "appropriate and cheerful," her memory was "adequate," she had "good" concentration, and a "good" fund of information.  (Tr. 368.)  Dr. Tromp diagnosed panic disorder with agoraphobia and social anxiety disorder.  (*Id.*)

On September 17, 2012, Dr. Tromp completed a Psychiatric/Psychological Impairment Questionnaire based on her examination of Plaintiff and her review of Plaintiff's records.  (Tr. 437-44.)  She opined that Plaintiff was markedly limited in her

abilities to maintain attention and concentration for extended periods, to perform activities within a schedule and maintain regular attendance, to work with others without being distracted by them, to complete a normal workweek, to perform at a consistent pace without unreasonably long rest periods, to interact with the public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers, and to travel to unfamiliar places or use public transportation.  (Tr. 440-42.)  She added that Plaintiff could not tolerate "even [a] low stress" work environment due to her intolerance of exposure to conflict and because leaving home and going places caused panic attacks.  (Tr. 443.)  She opined that Plaintiff would likely miss more than three workdays a month.  (Tr. 443-44.)

### III.    Administrative Hearing Testimony

Plaintiff was in her early fifties at the time of the administrative hearing.  (Tr.162.)  Plaintiff had a high school education.  (Tr. 43.)  Her past relevant work included waitress, hostess, and snack-shop supervisor.  (Tr. 43-44.)  Plaintiff testified that she lived in a room she rented at a friend's house.  (Tr. 41.)

Plaintiff testified that she smoked up to fifty cigarettes a day for about thirty years, but had recently cut back to one cigarette a day and was trying to stop smoking.  (Tr. 45.)  Plaintiff testified that she stopped working in 2002 because "it got too hard for [her] to drive to get to work" (Tr. 44), and later testified that she quit because it was hard for her to carry dishes because of her breathing.  (Tr. 45.)  She also testified that she had not worked since 2002 because it was hard for her to leave home.  (Tr. 44.)  Plaintiff explained that she waited until 2010 to file for disability insurance benefits because she "was really scared" of "going out of the house to do the paperwork and stuff."  (Tr. 61.)  Plaintiff testified that she had not driven since 2002, and that she was scared to drive after having been in car accidents in 1998 and 2002.  (Tr. 42-43.)  She relied on her sister to drive her places.  (*Id.*)

Plaintiff testified that she experienced panic attacks that made her shake and cry two to three times a month, and which were generally triggered by having to leave the

house or "have a test done." (Tr. 50.)  Plaintiff stated that, during an anxiety attack, she got shaky, cried, felt like her "heart[] [was coming] out of [her] chest," and could not breathe. (Tr. 47.)  Plaintiff further testified that she could not focus or concentrate during a panic attack, and she usually relied on her sister to "talk [her] out of" an attack. (Tr. 49.)  Plaintiff claimed she had panic attacks when she went somewhere in a car, and stated that she had a panic attack the morning of the administrative hearing. (Tr. 48-49.) She testified that she had "talked [her]self out of doctors' appointments because of [her] anxiety." (Tr. 48.)  Plaintiff stated that her doctor was trying to adjust her medications to "find one that work[ed]" for her. (*Id.*)  To prevent panic attacks, Plaintiff avoided leaving home. (Tr. 49.)  The ALJ noted that Plaintiff was shaking and she stated that it was because she felt nervous. (*Id.*)

When testifying about her COPD, Plaintiff stated that her doctors advised that her lungs were damaged from years of smoking, but that quitting would help her symptoms. (Tr. 50.)  Plaintiff testified that she had cut back to one cigarette a day for about one month, but she still had difficulty carrying things, such as taking her laundry basket from her bedroom to the washing machine, vacuuming, or moping. (Tr. 50-51.)  She testified that she could mop for about half an hour but then had to sit down and use her inhaler to recover her breathing before she finished the job. (Tr. 51.)  Plaintiff also testified that walking without carrying anything made her short of breath. (*Id.*)  She stated that she did not have problems breathing if she was standing still. (*Id.*)

Administrative expert Sandra Richter also testified at the administrative hearing. (Tr. 52-59.)  She identified Plaintiff's past relevant work as (1) counter supervisor, classified under the Dictionary of Occupational Titles (DOT) as an exertionally light, skilled job (DOT 311.137-010), (2) hostess, a light, semi-skilled job (DOT 352.667-010), and (3) waitress, a light, semi-skilled job (DOT 311.477-030). (Tr. 52.)

In response to the ALJ's questions, the vocational expert testified that an individual who was limited to unskilled light work would be unable to perform any of Plaintiff's past relevant work. (Tr. 53.)  However, the vocational expert testified that an

individual limited to unskilled light work, and who was also precluded from all interaction with the public and exposure to any respiratory irritants, could perform light, unskilled work as a mail clerk who sorted mail, a packager, and a bottle packager. (Tr. 53-54.)

The vocational expert further testified that an individual with marked limitations in the ability to work with or in proximity to others, to complete a normal workweek, and to perform at a consistent pace without unreasonably long rest periods, would be unable to perform any competitive work activity.   (Tr. 57-58.)   She also testified that an individual with marked limitations in the ability to maintain attention and concentration for extended periods, to maintain a schedule, and to be reasonably punctual, would be unable to sustain any work activity.  (Tr. 58-59.)

## IV.    The ALJ's Decision

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits).   To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

### A.    The Five Step Sequential Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her disability is severe.   20 C.F.R. § 404.1520(a)(4)(i) and (ii).   If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five.   At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the

1    claimant is presumptively disabled.  If not, the ALJ determines the claimant's residual

2    functional capacity (RFC).  At step four, the ALJ determines whether a claimant's RFC

3    precludes her from performing her past work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the

4    claimant establishes this prima facie case, the burden shifts to the government at step five

5    to establish that the claimant can perform other jobs that exist in significant number in the

6    national economy, considering the claimant's RFC, age, work experience, and education.

7    20 C.F.R. § 404.1520(a)(4)(v).  If the government does not meet this burden, then the

8    claimant is considered disabled within the meaning of the Act.

9        **B.    The ALJ's Application of the Five Step Evaluation Process**

10           Applying the five-step sequential evaluation process, the ALJ found that Plaintiff

11   had not engaged in substantial gainful activity during the relevant period.  (Tr. 23.)  At

12   step two, the ALJ found that Plaintiff had the following severe impairments: "shortness

13   of breath, Chronic Obstructive Pulmonary Disease (COPD), emphysema, tobacco abuse;

14   and an anxiety disorder with panic attacks (20 C.F.R. § 416.920(c))."  (*Id.*)  At the third

15   step, the ALJ found that the severity of Plaintiff's impairments did not meet or medically

16   equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

17   (*Id.*)  The ALJ next concluded that Plaintiff retained "the residual functional capacity to

18   perform light work with restrictions as light work is defined in 20 C.F.R. § 416.967(b)."

19   (Tr. 25.)  The ALJ found that Plaintiff was limited to unskilled work and work with no

20   requirement for interaction with the public.  (*Id.*)  He further found that Plaintiff should

21   avoid exposure to extreme temperatures, humidity, dust, gases, or fumes.  (*Id.*)

22           At step four, the ALJ concluded that Plaintiff could not perform her past relevant

23   work.  (Tr. 28.)  At step five, the ALJ found that considering Plaintiff's age, education,

24   work experience, and RFC, she could perform other "jobs that exist in significant

25   numbers in the national economy."  (Tr. 28-29.)  The ALJ concluded that Plaintiff had

26   not been under a disability within the meaning of the Act since November 4, 2010

27   through the date of the decision.  (Tr. 29.)

28

1   **V.      Standard of Review**

2           The district court has the "power to enter, upon the pleadings and transcript of

3   record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

4   with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district

5   court reviews the Commissioner's final decision under the substantial evidence standard

6   and must affirm the Commissioner's decision if it is supported by substantial evidence

7   and it is free from legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996);

8   *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Even if the

9   ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are

10  harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

11          Substantial evidence means more than a mere scintilla, but less than a

12  preponderance; it is "such relevant evidence as a reasonable mind might accept as

13  adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

14  (citations omitted); *see also Webb v Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In

15  determining whether substantial evidence supports a decision, the court considers the

16  record as a whole and "may not affirm simply by isolating a specific quantum of

17  supporting evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

18  quotation and citation omitted).  The ALJ is responsible for resolving conflicts in

19  testimony, determining credibility, and resolving ambiguities.  *See Andrews v. Shalala*,

20  53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to

21  more than one rational interpretation, [the court] must defer to the ALJ's conclusion."

22  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing

23  *Andrews*, 53 F.3d at 1041).

24  **VI.     Plaintiff's Claims**

25          Plaintiff asserts that the ALJ erred in assigning little weight to the opinions of

26  treating physician Dr. Wise and examining physician Dr. Tromp.   (Doc. 18 at 11.)

27  Plaintiff also argues that ALJ erred by finding her subjective complaints not credible.

28  (*Id.* at 15.)  In response, the Commissioner argues that the ALJ's decision is free from

legal error and is supported by substantial evidence in the record.  (Doc. 19.)  Plaintiff has not filed a reply in opposition to the Commissioner's response and the deadline to do so has passed.  (*See* Doc. 11.)

### A.   Assessing a Claimant's Credibility

Plaintiff asserts that the ALJ erred by discrediting her symptom testimony. (Doc. 18 at 15.)   An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom.  *Smolen*, 80 F.3d at 1282.  Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce his pain.  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms, including pain, limit the claimant's ability to work.  *See* 20 C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors,

1   medication taken, and treatments for relief of pain or other symptoms.   *See* 20

2   C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

3         At this second evaluative step, the ALJ may reject a claimant's testimony

4   regarding the severity of her symptoms only if the ALJ "makes a finding of malingering

5   based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc.*

6   *Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and

7   convincing reasons" for finding the claimant not credible.[5]   *Carmickle*, 533 F.3d at 1160

8   (quoting *Lingenfelter*, 504 F.3d at 1036).   "'The clear and convincing standard is the

9   most demanding required in Social Security Cases.'"   *Garrison*, 759 F.3d at 1015

10   (quoting *Moore v. Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).   Because there

11   was no record evidence of malingering, the ALJ was required to provide clear and

12   convincing reasons for concluding that Plaintiff's subjective complaints were not wholly

13   credible.   Plaintiff argues that the ALJ failed to do so.

14                **1.     Reasons for Discrediting Plaintiff's Symptom Testimony**

15                     **a.     The Objective Medical Evidence**

16         The ALJ discounted Plaintiff's allegations about the severity of her symptoms and

17   limitations as unsupported by the objective medical record.   (Tr. 24-25.)   The record

18   supports the ALJ's determination.   For example, as the ALJ noted, spirometry testing in

19   October 2010 showed "moderate COPD."   (Tr. 27, 271, 288, 339, 408.)   The ALJ also

20   found that the evidence of Plaintiff's anxiety and related symptoms was based on

21   Plaintiff's self-reporting, not objective testing.   (*See* Section II.A.)   However, the absence

22   of fully corroborative medical evidence cannot form the *sole* basis for rejecting the

23   credibility of a claimant's subjective complaints.   *See Cotton v. Bowen*, 799 F.2d 1403,

24   1407 (9th Cir. 1986) (it is legal error for "an ALJ to discredit excess pain testimony

25   solely on the ground that it is not fully corroborated by objective medical findings"),

26   *superseded by statute on other grounds as stated in Bunnell v. Sullivan*, 912 F.2d 1149

27   _____

28         [5]   The Ninth Circuit has rejected the Commissioner's suggestion (Doc. 19 at 11) that a lesser standard than "clear and convincing" should apply.   *Garrison*, 759 F.3d at 1015 n.18.

(9th Cir. 1990); *see also Burch*, 400 F.3d at 681 (explaining that the "lack of medical evidence" can be "a factor" in rejecting credibility, but cannot "form the sole basis"); *Rollins v. Massanari*, 261 F.3d 853, 856-57 (9th Cir. 2001) (same).  Thus, absent some other stated legally sufficient reason for discrediting Plaintiff, the ALJ's credibility determination cannot stand.  However, as discussed below, the ALJ provided additional legally sufficient reasons for discounting Plaintiff's symptom testimony.

### b.    Lack of Full Cooperation

The ALJ found that Plaintiff did not fully cooperate with spirometry testing during a January 2011 appointment with state agency examining physician Dr. Breicheisen. (Tr. 27.)  The record supports that finding.  (Tr. 302 (noting that Plaintiff did "gave inadequate effort" during a pulmonary function test).)  The ALJ properly considered Plaintiff's lack of full effort during testing with state agency physician Dr. Brecheisen to support his adverse credibility determination.  *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (an ALJ may rely on lack of cooperation or poor effort during examinations to discount a claimant's credibility); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (the ALJ did not err in discrediting the claimant's symptom testimony based on her lack of cooperation during consultative examination in support of his adverse credibility determination).  Plaintiff's failure to participate fully in testing conducted by a state agency physician is a clear and convincing reason for discounting her credibility that is supported by substantial evidence in the record.

### c.    Improvement in Symptoms

The ALJ also discounted Plaintiff's symptom testimony because treatment notes showed that Plaintiff's respiratory condition improved with reduced smoking.  (Tr. 27.) In assessing a claimant's credibility about her symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication," and treatment other than medication, that the claimant has received for relief of pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(iv) and (v).  Evidence that treatment can effectively control a claimant's symptoms may be a clear and convincing reason to find a claimant less

1   credible.  *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006)

2   (stating that "[i]mpairments that can be controlled effectively with medication are not

3   disabling for purposes of determining eligibility for SSI benefits.").

4         As the ALJ noted (Tr. 27), the record reflects that Plaintiff's COPD symptoms

5   improved with treatment and with reduced smoking.  (Tr. 335 (noting "significant

6   improvement on advair/atrovent," "down to 2 cig/day," and noting that Plaintiff had

7   made "enormous strides in weaning herself" from cigarettes and had "significant

8   improvement" in cardio-pulmonary functioning).)  Accordingly, the improvement of

9   Plaintiff's symptoms with reduced smoking was a clear and convincing reason for

10  discounting her credibility that is supported by substantial evidence in the record.

### d.    Conservative Treatment

12        The ALJ also discounted Plaintiff's testimony because he found that she had

13  "moderate COPD" for which she received conservative treatment, noting that she was not

14  hospitalized for COPD symptoms.  (Tr. 27.)  An ALJ may rely on a claimant's

15  conservative course of treatment to reject her complaints of disabling limitations or pain.

16  *See Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989); *Johnson v. Shalala*, 60 F.3d 1428,

17  1434 (9th Cir. 1995) (the claimant's course of conservative treatment for a back injury

18  was a clear and convincing reason for disregarding testimony that the claimant was

19  disabled).

20        The record reflects that Plaintiff complained of shortness of breath with activity,

21  and stated that she did not have any problems if she was standing still.  (Tr. 51, 262, 271.)

22  Treatment notes described Plaintiff's COPD as "moderate."[6]  (Tr. 271, 288, 339, 408.)

23  Because the medical record described Plaintiff's COPD as moderate, the ALJ did not err

24  by characterizing Plaintiff's COPD as moderate.

---

[6] The grading system for COPD defines "moderate" as the second of four grades of severity.   See http://copd.about.com/od/copdbasics/a/stagesofcopd.htm; see also http://copd.about.com/od/copdtreatment/a/Treatment-For-Moderate-Copd.htm  ("If you've reached Stage II, you are probably just noticing your symptoms – primarily shortness of breath that worsens with activity.") (Last visited 2/17/2015.)

1    Additionally, the ALJ's characterization of Plaintiff's treatment as conservative is

2 supported by substantial evidence in the record.  Between 2010 and 2012, Plaintiff

3 received regular treatment for COPD-related breathing difficulties.  (Section II.A.1 and

4 A.2.)  That treatment typically resulted in a prescription of inhalers, recommendations

5 that Plaintiff stay hydrated and use a humidifier, and that she quit smoking.  (Tr. 258,

6 263, 271, 360, 363, 358, 399, 402-03, 449.)  *See Hayes v. Colvin*, 2014 WL 7405647, at

7 *3 (D. Or. Dec. 30, 2014) (concluding that ALJ properly characterized as conservative

8 the claimant's treatment for COPD, which included prescription anti-inflammatory

9 medication, pain medication, aerosol inhalers, and a recommendation to quit smoking).

10 The record also reflects that Plaintiff was not hospitalized for COPD.  As Plaintiff points

11 out, she visited Urgent Care in March 2012.  (Doc. 18 at 14.)  However, the primary

12 diagnosis on that visit was bronchitis for which treatment providers prescribed antibiotics

13 and an over-the-counter pain reliever and advised Plaintiff to rest and drink fluids.

14 (Tr. 318.)  Accordingly, the conservative nature of Plaintiff's treatment for moderate

15 COPD was a clear and convincing reason for discounting her credibility that is supported

16 by substantial evidence in the record.

17    **e.  Lack of Treatment with a Specialist**

18    To support his adverse credibility determination, the ALJ also noted that there was

19 no evidence of treatment with a mental health professional.  (Tr. 27.)  The Commissioner

20 argues that this was a legally sufficient reason for discounting Plaintiff's credibility that

21 is supported by the record (Tr. 19 at 11), and Plaintiff has not replied in opposition to that

22 assertion.

23    Plaintiff contends that the ALJ erroneously discounted her credibility based on her

24 failure to seek treatment from a specialist.  (Doc. 18 at 19.)  In *Regennitter v. Comm'r of*

25 *Soc. Sec. Admin.*, 166 F.3d 1294, 1299-1300 (9th Cir. 1999), the Ninth Circuit "criticized

26 the use of a lack of treatment to reject mental complaints" and again noted that "'it is a

27 questionable practice to chastise one with a mental impairment for the exercise of poor

28 judgment in seeking rehabilitation.'"  *Id.*  (quoting *Blankenship v. Bowen*, 874 F.2d 1116,

1124 (9th Cir. 1989)).  In *Regennitter* and similar cases, however, the plaintiff failed to seek any mental health treatment at all.  *See Regennitter*, 166 F.3d at 1299-1300 (concluding that the ALJ improperly discounted an examining physician's opinion based on the plaintiff's "failure, because of his poverty, to seek treatment by any mental professional") (internal quotation marks omitted)); *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("the fact that claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [the physician's] assessment of claimant's condition is inaccurate").

Here, by contrast, Plaintiff recognized that she needed help, and sought and received mental-health treatment from primary care physician Dr. Wise.  (Tr. 354-59, 363, 449.)  However, she failed to comply with his advice that she obtain counseling. There is also no indication that Plaintiff followed NP Collins's 2010 referral to a "mental health facility" for her mental health issues.  (Tr. 263.)  Plaintiff's failure to follow treatment advice and to seek counseling or treatment from a mental health care provider is a clear and convincing reason for discounting her symptom testimony.  *See Minter v. Comm'r Soc. Sec.*, 2012 WL 1866608, at *5 (D. Or. May 22, 2012) (when the claimant recognized that she needed help and sought out counseling, her failure to follow through with that treatment was a clear and convincing reason for the ALJ to discredit her symptom testimony).

Plaintiff contends that she did not seek treatment from a mental health professional "due to fear of leaving the house [and] trusting another medical provider." (Doc. 18 at 19 (citing Tr. 367).)  However, the record reflects that Plaintiff left the house to attend regular appoints with treating providers NP Rollins and Dr. Wise and that she attended one-time examinations with Dr. Rose, Dr. Breicheisen, and Dr. Tromp.  (Sections II.A and II.B.)  Additionally, as the ALJ noted (Tr. 28), Plaintiff and her sister completed function reports indicating that Plaintiff went outside twice a week (Tr. 220), and left the house up to once or twice a month to shop for "personal care" items, groceries, or

clothing.  (Tr. 220, 235.)  The function reports also indicate that Plaintiff regularly went to Walmart and to doctors' appointments.  (Tr. 236.)  Accordingly, Plaintiff's failure to seek treatment from a mental health professional was a clear and convincing reason for discounting her credibility that is supported by substantial evidence in the record.

### f.  Plaintiff's Daily Activities

The ALJ also discounted Plaintiff's symptom testimony based on "the extensive activities she engaged in."  (Tr. 28.)  Plaintiff asserts that this was not a clear and convincing reason for discrediting her symptom testimony.  (Doc. 18 at 19-21.)

The Ninth Circuit has stated that a claimant engaging in normal daily activities "does not in any way detract from [his] credibility as to [his] overall disability."  *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).  As the Ninth Circuit has explained, "[o]ne does not need to be 'utterly incapacitated' in order to be disabled."  *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Rather, the daily activities must involve skills that could be transferrable to a workplace and a claimant must spend a "substantial part of [her] day" engaged in those activities.  *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (finding that the ALJ erred in failing to "meet the threshold for transferable work skills, the second ground for using daily activities in credibility determinations.").  Considering this standard and the record in this case, the ALJ erred in relying on Plaintiff's ability to participate in typical daily activities to discredit her symptom testimony.  However, any error in relying on this reason to support the ALJ's credibility determination is harmless because he gave other legally sufficient reasons for discounting her subjective complaints.  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195-97 (9th Cir. 2004) (applying harmless error standard where one of the ALJ's several reasons supporting an adverse credibility finding was held invalid).

In summary, although the Court does not accept all of the ALJ's reasons in support of his adverse credibility determination, the ALJ provided sufficient legally sufficient reasons that are supported by substantial evidence in support of his credibility determination and, therefore, the Court affirms that determination.  *See Batson*, 359 F.3d

1   at 1197 (stating that the court may affirm an ALJ's overall credibility conclusion even

2   when not all of the ALJ's reasons are upheld); *Tonapetyan*, 242 F.3d at 1148 (stating that

3   "[e]ven if we discount some of the ALJ's observations of [the claimant's] inconsistent

4   statements and behavior . . . we are still left with substantial evidence to support the

5   ALJ's credibility determination.").

6   **B.   Weight Assigned Medical Opinion Evidence**

7        Plaintiff also argues that the ALJ erred in his assessment of the medical source

8   opinion evidence.  In weighing medical source evidence, the Ninth Circuit distinguishes

9   between three types of physicians: (1) treating physicians, who treat the claimant;

10  (2) examining physicians, who examine but do not treat the claimant; and (3) non-

11  examining physicians, who neither treat nor examine the claimant.  *Lester v. Chater*, 81

12  F.3d 821, 830 (9th Cir. 1995).  Generally, more weight is given to a treating physician's

13  opinion.  *Id*.  The ALJ must provide clear and convincing reasons supported by

14  substantial evidence for rejecting a treating or an examining physician's uncontradicted

15  opinion.  *Id*.; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject

16  the controverted opinion of a treating or an examining physician by providing specific

17  and legitimate reasons that are supported by substantial evidence in the record.  *Bayliss v.*

18  *Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.  The Court

19  considers Plaintiff's claims regarding the weight the ALJ assigned to the medical source

20  opinions in light of these standards.

21  **1.   Dr. Wise's Opinions**

22       As discussed in Section II.B.3, Dr. Wise opined that, due to COPD and chronic

23  severe anxiety, Plaintiff was unable to work and he expected her disability to last longer

24  than twelve months.[7]  (Tr. 27, 455.)  The ALJ gave Dr. Wise's opinion little weight

25  because his conclusions were inconsistent with the medical record.   (Tr. 27.)

26  _____

27       [7]  Dr. Wise did not assess any specific physical functional limitations and whether
    a claimant is able to work is an issue reserved to the Commissioner.   20 C.F.R. §
28  416.927(d).  A treating source's opinion on issues reserved to the Commissioner is never
    entitled to controlling weight or given special significance.  SSR 96-5p, 1996 WL
    374183, at *2.

"[C]ontrolling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." SSR 96–2p, 1996 WL 374188, *1; *see also Bray v. Comm'r of Soc. Sec. Admin*., 554 F.3d 1219, 1138 (9th Cir. 2009) ("the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical finding").

The record supports the ALJ's determination that Dr. Wise's opinion that Plaintiff was unable to work due to COPD was inconsistent with the medical record. The record reflects that Plaintiff had "moderate COPD" and that she reported shortness of breath only on exertion. (Tr. 51, 262, 271, 288, 339, 408.) Additionally, on examination, Plaintiff often had "clear breath sounds," (Tr. 362), non-labored breathing (Tr. 358), "no rales, rhonci, or wheezes" (Tr. 262, 272, 398, 362, 358), and was found to be in no acute distress. (Tr. 262, 272, 398, 362, 359, 358, 355, 448.)

The ALJ also noted that the medical records reflected that Plaintiff's symptoms of COPD improved with reduced cigarette intake, and that she did not have "significant exacerbations or hospitalization" for her COPD. (Tr. 27 (citing Admin. Hrg. Exs. 1F at 2-17, 15F at 2-11, 20F).) The record supports the ALJ's conclusion that Plaintiff's COPD symptoms improved with reduced smoking (Tr. 398-99) and that, although she went to Urgent Care for bronchitis, she was not hospitalized for COPD. (Tr. 318.)

The ALJ also gave little weight to Dr. Wise's opinion of Plaintiff's functional limitations related to her mental health and to his opinion that Plaintiff was incapable of performing even a low stress job. The ALJ found these opinions inconsistent with the medical record. (Tr. 27, 324.) The record supports the ALJ's conclusion. Dr. Wise saw Plaintiff in June, July, August, and September 2012. (Tr. 361-63, 359-60, 357-58, 354-44, 446-49.) However, the mental health status examinations during those visits did not show mental health abnormalities. (Tr. 26, 359 ("pleasant, comfortable, OX3, alert"); Tr. 358 ("pleasant, comfortable, OX3, alert"); Tr. 355 ("pleasant, comfortable, OX3, alert"; "good eye contact, normal insight, no thought disturbances noted, slightly anxious

appearing").  Treatment notes also indicate that Plaintiff had "normal insight and no thought disturbances."  (Tr. 355.)  Thus, as the ALJ found, Dr. Wise's treatment notes were inconsistent with his opinions of her mental functional abilities.

Dr. Wise's opinion was also inconsistent with the opinion of examining physician Dr. Rose, who performed a psychological evaluation of Plaintiff in January 2011. (Tr. 26, 296-300.)  Plaintiff reported daily anxiety and worry about daily stressors and symptoms of nausea, mild shaking, shortness of breath, a racing heart, and nervousness. (Tr. 297-98.)  At that time, Plaintiff did not have a history of mental health problems or treatment, other than one visit with a counselor during her divorce thirteen years earlier. (Tr. 297.)  Dr. Rose conducted a mental status examination and concluded that Plaintiff had mild intellectual deficits, but overall appeared to be within normal limits.  (Tr. 296.) Dr. Rose diagnosed anxiety disorder and possible mild intellectual deficits and concluded that Plaintiff did not have any "significant psychiatric barriers to employment." (Tr. 300.)  Based on this record evidence, the ALJ did not err in assigning little weight to Dr. Wise's opinions regarding Plaintiff's physical and mental functional limitations as inconsistent with the record.

## 2.    Dr. Tromp's Opinions

On September 18, 2012, Plaintiff underwent a psychological evaluation with Dr. Tromp.  (Tr. 26, 365-70.)  Plaintiff said she experienced anxiety and panic attacks, and that she was a hermit because she did not like to leave her house.  (Tr. 366.)  During a mental status examination, Plaintiff's mood was "a little panicky, a little nervous but comfortable," and she laughed.  (Tr. 26, 368.)  Dr. Tromp did not identify any other abnormalities.  (Tr. 26, 368-69.)  On mental status testing, Plaintiff scored 23/30, which Dr. Tromp said "suggest[ed] impaired cognition, although much of this may be functional (due to anxiety)."  (Tr. 369.)  Dr. Tromp opined that Plaintiff would have considerable difficulty with detailed or complex tasks.  (Tr. 370.)  Dr. Tromp noted that "[b]ased on her self-report and the report of Dr. Wise, it appears that she avoids social interaction . . . ." (Tr. 370.)

Dr. Tromp opined that Plaintiff had moderate impairment in the ability to remember locations and work-like procedures, understand and remember detailed instructions, and carry out detailed instructions.  (Tr. 27, 440.)  She found marked limitations in Plaintiff's ability to maintain attention and concentration for extended periods away from home, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, and work in coordination with or proximity to others without being distracted by them.  (Tr. 27, 440-41.)  Dr. Tromp opined that Plaintiff was incapable of even low stress work and would likely miss more than three days of work per month due to her impairments or treatment.  (Tr. 433-44.)

The ALJ gave little weight to Dr. Tromp's opinion regarding Plaintiff's anxiety because it was inconsistent with the record.  (Tr. 27.)  Inconsistency with the record is a specific and legitimate reason for discounting examining physician Dr. Tromp's opinion, and the record supports that ALJ's conclusion.[8]  *See Bayliss v.* 427 F.3d at 1216 (an ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record)

As the ALJ noted, records from North Country do not document abnormal mental status findings.  (Tr. 27) (citing Admin. Hrg. Exs. 1F at 2-17, 15F at 2-11. and 20F).)  Similarly, as discussed in Section II.A.2 and VI.B.1, Dr. Wise's treatment notes do not document mental health abnormalities.  (Tr. 355, 358, 359.)  Additionally, Dr. Tromp's notes on examination reflect that Plaintiff had a logical and goal-directed thought process, good comprehension, a "panicky" but "comfortable" mood, an appropriate and cheerful affect, good concentration, adequate memory, and a full fund of knowledge.  (Tr. 368.)

To support her claim of error, Plaintiff points to treatment notes that document her reports of anxiety symptoms.  (Doc. 18 at 15.)   The ALJ assigned little weight to Dr. Tromp's opinion to the extent that it was based on Plaintiff's self-reports.  (Tr. 27.)  Because the ALJ properly discredited Plaintiff's subjective complaints, as discussed in

---

[8] Dr. Tromp's opinion was contradicted by Dr. Rose's opinion.  (Tr. 296-300.)

Section VI.A, the ALJ did not err in this regard.  *See Bray*, 554 F.3d at 1228 (9th Cir. 2009) (ALJ properly discounts a physician's opinion that is based solely upon claimant's self-reporting if ALJ concludes that claimant's self- reporting is not credible); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (rejecting physician's opinion in part because it was based on claimant's subjective complaints, not on new objective findings); *Tonapetyan*, 242 F.3d at 1149 (medical opinion premised on subjective complaints may be disregarded when record supports ALJ in discounting claimant's credibility).

Additionally, as the Commissioner notes (Doc. 19 at 10), the record also includes a Function Report that Plaintiff completed in February 2011.  (Tr. 217-25.)  On the Function Report, Plaintiff wrote that she went out twice a week and could do so alone.  (Tr. 220.)  She reported that she could shop in stores without accompaniment.  (Tr. 220-21.)  Plaintiff also reported that she got along with authority figures and handled stress and changes in routine "ok."  (Tr. 223.)  Plaintiff's statements on her Function Report are inconsistent with Dr. Tromp's opinion regarding Plaintiff's mental functional limitations.

Although the ALJ did not specifically cite Plaintiff's Function Report in his discussion of the weight assigned to Dr. Tromp's opinion, the ALJ referred to that report several times in his decision indicating that he considered it in his evaluation of the evidence.  (Tr. 24, 28 (citing Admin. Hrg. Ex. 7E).)  The Commissioner properly points out this "additional support for the Commissioner's and the ALJ's position," *Warre*, 439 F.3d at 1005 n.3, and the Court considers that Function Report evidence that supports the ALJ's conclusion that Dr. Tromp's opinion was inconsistent with the record.

Considering the record as a whole, the ALJ rationally concluded that the medical record did not support the functional limitations that Dr. Wise and Dr. Tromp identified, and even though the record includes evidence that could be interpreted more favorably to Plaintiff, the Court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation."  *Magallanes*, 881 F.2d at 750; *see Batson*, 359 F.3d at 1198.

**VII.     Conclusion**

        As set forth above, the ALJ's opinion is supported by substantial evidence in the record and is free of harmful legal error.

        Accordingly,

        **IT IS ORDERED** that the Commissioner's disability determination is **AFFIRMED**.    The Clerk of Court is directed to enter judgment in favor of the Commissioner and against Plaintiff and to terminate this action.

        Dated this 17th day of February, 2015.

                                        Bridget S. Bade
                                United States Magistrate Judge